# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARBARA STEETLE, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>HIGHMARK, INC., a Pennsylvania non-profit corporation,<br><br>                    Defendant. | Case No.:   22-362<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff BARBARA STEETLE ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant HIGHMARK, INC. ("Highmark" or "Defendant"), based upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigations of her attorneys.

## NATURE OF THE ACTION

1.      Between December 13, 2022 and December 15, 2022, Highmark had its data servers breached through a ransomware attack by unauthorized third-party hackers, who stole the highly sensitive personal and medication information—including, *inter alia*, the names, enrollment information, identification number, claims or treatment information, dates or service, procedures, prescription information, dates of birth, email addresses, phone numbers, driver's license numbers, passport numbers, Social Security numbers and financial information—of

approximately 275,639 of its patients.[1]

2.     Highmark proclaims itself as one of America's leading health insurance organizations, providing coverage to approximately 6.8 million members in Pennsylvania, Delaware, New York, and West Virginia.[2] As a requirement to procure its services, Highmark requires that its patients provide Highmark with their Personal Identifying Information ("PII") and Protected Health Information ("PHI"). As a result, Highmark collects and stores the PII and PHI of millions of individuals who have utilized its services.

3.     Under statute and regulation, Highmark had a duty to implement reasonable, adequate industry-standard data security policies safeguards to protect patient PII and PHI. Highmark failed to do so. Highmark expressly recognizes those duties in its public-facing Privacy Policy, wherein it states that "[w]e follow generally accepted industry standards to protect the information submitted to us, both during transmission and once we receive it."[3] Despite this, Highmark did not obtain its patients' consent before allowing their information to be accessed and exfiltrated by unauthorized third-party hackers.

4.     Plaintiff, individually and on behalf of those similarly situated persons (hereafter, "Class Members"), brings this Class Action to secure redress against Highmark for its reckless and negligent violation of their privacy rights. Plaintiff and Class Members are members and former members of Highmark who had their PII and PHI collected, stored and ultimately breached by Highmark.

---

[1]   *Cases Currently Under Investigation*, U.S. Department of Health and Human Services, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed February 22, 2023).
[2]   "Our Story" https://www.highmark.com/about/our-story.html (last accessed February 22, 2023).
[3]   *Privacy Policy*, https://www.lcmh.com/privacy-policy/ (last accessed February 22, 2023).

5.      Plaintiff and Class Members have suffered injuries and damages. As a result of Highmark's wrongful actions and inactions, Plaintiff's and Class Members' PII and PHI have been compromised. Plaintiff and Class Members had their privacy rights violated and are now exposed to a heightened risk of identity theft and credit fraud for the remainder of their lifetimes. Plaintiff and Class Members must now spend time and money on prophylactic measures, such as increased monitoring of their personal and financial accounts and the purchase of credit monitoring services, to protect themselves from future loss. Plaintiff and Class Members have also lost the value of their PII and PHI.

6.      As a result of Highmark's wrongful actions and inactions, patient information was stolen. Plaintiff and Class Members who have had their PII/PHI compromised by nefarious third-party hackers, have had their privacy rights violated, have been exposed to the risk of fraud and identify theft, and have otherwise suffered damages. Plaintiff and Class Members bring this action to secure redress against Highmark.

## THE PARTIES

7.      Plaintiff is a Pennsylvania citizen residing in Butler, Pennsylvania. Plaintiff is a member of Highmark's health network. On or around February 13, 2022, Plaintiff received a data breach notice from Highmark informing her that her PII and PHI had been implicated in the data breach.

8.      Highmark is a Pennsylvania non-profit corporation headquartered at 120 Fifth Avenue, Pittsburgh, Pennsylvania 15222.

## JURISDICTION AND VENUE

9.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 for claims that arise under the Stored Communications Act, 18 U.S.C. § 2701, *et seq*. The

Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state claims because they are so related to the federal claims in that they form a part of the same case or controversy.

10.     Additionally, this Court has subject matter jurisdiction over the state law claims asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Minimal diversity is met because, upon the original filing of this complaint, there exist members of the putative class who are domiciled in states different from Highmark. This is evidenced by the fact that Highmark has sent data breach notifications to at least 500 California residents[4], and at least one Vermont resident.[5] Further, Highmark itself has stated that some of its members are located throughout the states of Delaware, New York, and West Virginia, in addition to its home state of Pennsylvania. Additionally, there exist at least 100 putative class members, and the amount in controversy in this action exceeds $5 million.

11.     The Court also has personal jurisdiction over Highmark because it routinely conducts business in the state of and has sufficient minimum contacts in Pennsylvania to have intentionally availed itself to this jurisdiction by operating and marketing its services in Pennsylvania.

12.     Venue is proper in this District because, among other things: (a) Highmark is a resident of this District and directed its activities at residents in this District; and (b) many of the acts and omissions that give rise to this action took place in this judicial District for services provided in this District.

13.     Venue is further appropriate in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Highmark resides in and conducts substantial business in the Western

---

[4]    https://oag.ca.gov/ecrime/databreach/reports/sb24-562696.
[5]    https://ago.vermont.gov/sites/ago/files/wp-content/uploads/2021/07/2021-06-30-Highmark-Notice-of-Data-Breach-to-Consumers.pdf.

District, (b) Highmark directed its services at residents in the Western District; and (c) many of the acts and omissions that give rise to this action took place in the Western District.

## FACTUAL ALLEGATIONS

### A.    The Data Breach

14.    Highmark is a HIPAA Business Associate, who proclaims itself as one of the leading healthcare insurance organizations in the United States. As a requirement to procure its services, Highmark requires its patients to provide it with their sensitive PII and PHI. As a result, Highmark's systems store the PII and PHI of tens of thousands of patients who have utilized its healthcare network services.

15.    Between December 13, 2022 and December 15, 2022, Highmark's systems were accessed by unauthorized third-party hackers, who exfiltrated Plaintiff's and Class Members' sensitive PII and PHI—including, *inter alia*, their names, enrollment information, identification numbers, claims or treatment information, dates of service, procedures, prescription information, dates of birth, email addresses, phone numbers, driver's license numbers, passport numbers, Social Security numbers and financial information. In its data breach notification filed with the United States Secretary of Health and Human Services, Highmark reported that the data breach had affected 275,639 individuals.[6]

### B.    Highmark's Failure to Provide Reasonable, Adequate, and Compliant Data Security

16.    Plaintiff and Class Members provided their sensitive PII and PHI to Highmark with the reasonable expectation and mutual understanding that Highmark would implement reasonable

---

[6]    *Cases Currently Under Investigation*, U.S. Department of Health and Human Services, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited February 22, 2023).

and adequate cybersecurity safeguards to protect their PII and PHI from unauthorized disclosure. What Plaintiff and Class Members did not expect was that Highmark would cause their sensitive PII and PHI to be obtained by unauthorized third parties by leaving itself vulnerable to a ransomware attack.

17.     Ransomware is a form of malware designed to gain unauthorized access to and encrypt files on a device or server, rendering any files and the systems that rely on them unusable. Malicious actors use ransomware to unlawfully obtain private, sensitive and/or confidential information, and then demand a ransom in exchange for decrypting the affected files. Ransomware attacks are often targeted towards businesses such as Highmark that are known to collect and store the confidential and sensitive PII/PHI of hundreds of thousands of individuals.

18.     Ransomware attacks are highly preventable through the implementation of reasonable and adequate cybersecurity safeguards and/or proper employee cybersecurity training, as the vast majority of ransomware incidents are caused by poor user practices, lack of cybersecurity training, and weak passwords or access management.[7] For instance, ransomware is most commonly spread through "phishing" emails sent to employees with customer or patient data on their devices, which contain malicious attachments that allow a hacker to access that patient data. Ransomware is also commonly spread when an employee visits an infected website on a device connected to a company server. As such, businesses with adequate and reasonable data security practices train their employees not to open email attachments from unrecognized emails or visit unauthorized websites on company devices.

---

[7]     "Most common delivery methods and cybersecurity vulnerabilities causing ransomware infections according to MSPs worldwide as of 2020." Statista, https://www.statista.com/statistics/700965/leading-cause-of-ransomware-infection/ (last accessed February 22, 2023).

19.     Highmark notes in its Notice of Privacy Practices that it is "committed to protecting the privacy of your Protected Health Information," and that it is "required under applicable federal and state laws to maintain the privacy of your protected health information."[8] Highmark's Notice of Privacy Policies goes on to promise that "We restrict access to our members' non-public personal information to those employees, agents, consultants and health care providers who need to know that information to provide health products or services" and that it "maintain[s] physical, electronic and procedural safeguards that comply with state and federal regulations to guard non-public personal financial information from unauthorized access, use and disclosure."[9]

20.     Despite these promises, Highmark did not implement reasonable data security safeguards and protocols to protect Plaintiffs' and Class Members' PII/PHI, and ultimately allowed nefarious third-party hackers to breach its data servers and exfiltrate Plaintiff's and Class Members' sensitive PII/PHI.

**C.     Highmark's Obligation to Protect Patient PII/PHI Under State and Federal Law**

21.     As a HIPAA business associate, Highmark holds a statutory duty under HIPAA and other federal and state statutes to safeguard Plaintiff's and Class Member's PII/PHI.

22.     Under the HIPAA Privacy Rule, Highmark is required to:

a.     Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives maintains or transmits;

b.     Protect against any reasonably anticipated threats or hazards to

---

[8]    *Id.*
[9]    *Id.*

the security or integrity of such information;

c.  Protect against any reasonably anticipated uses or disclosures of

such information that are not permitted; and

d.  Ensure compliance by their workforce.

45 C.F.R. § 164.306(a).

23.    The HIPAA Privacy Rule also requires Highmark to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under 45 C.F.R. § 164.306(e) and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights" under 45 C.F.R. § 164.312(a)(1).

24.    Further, the Federal Trade Commission Act, 15 U.S.C. § 45 prohibits Highmark from engaging in "unfair or deceptive acts or practices affecting commerce." The Federal Trade Commission has found that a company's failure to maintain reasonable and appropriate data security for the consumers' sensitive personal information is an "unfair practice" in violation of the Federal Trade Commission Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3rd Cir. 2015).

25.    Highmark failed to comply with each of these state and federal statutes by failing to implement and maintain reasonable security procedures to protect Plaintiff and Class Members' PII/PHI.

**D.    Applicable Standards of Care**

26.    In addition to its obligations under state and federal law, Highmark owed a duty to Plaintiff and the Class Members to exercise reasonable care in obtaining, retaining, securing,

safeguarding, deleting and protecting the PII/PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Highmark owed a duty to Plaintiff and the Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer system and networks, and the personnel responsible for them, adequately protected the PII/PHI of Plaintiff and Class Members.

27.    Highmark owed a duty to Plaintiff and the Class Members to design, maintain, and test their computer system to ensure that the PII/PHI in Highmark's possession was adequately secured and protected.

28.    Highmark owed a duty to Plaintiff and the Class Members to create and implement reasonable data security practices and procedures to protect the PII/PHI in its possession, including adequately training its employees and others who accessed the PII/PHI in Highmark's possession, including adequately training its employees and others who accessed PII/PHI in its computer systems on how to avoid falling victim.

29.    Highmark owed a duty to Plaintiff and the Class Members to act upon data security warnings and alerts in a timely fashion.

30.    Highmark owed a duty to Plaintiff and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' PII/PHI from theft because such an inadequacy would be a material fact in the decision to provide or entrust their PII/PHI to Highmark.

31.    Highmark owed a duty to Plaintiff and the Class Members to disclose in a timely and accurate manner when the data breach occurred.

32.    Highmark owed a duty of care to Plaintiff and the Class Members because they were foreseeable and probable victims of any inadequate data security practices. Highmark

received PII/PHI from Plaintiff and Class Members with the understanding that Plaintiff and Class Members expected their PHI/PII to be protected from disclosure. Highmark knew that a breach of its data systems would cause Plaintiff and Class Members to incur damages.

### E.    Stolen Information Is Valuable to Hackers and Thieves

33.    It is well known, and the subject of many media reports, that PII/PHI is highly coveted and a frequent target of hackers. Especially in the technology industry, the issue of data security and threats thereto is well known. Despite well-publicized litigation and frequent public announcements of data breaches, Highmark opted to maintain an insufficient and inadequate system to protect the PII/PHI of Plaintiff and Class Members.

34.    Plaintiff and Class Members value their PII/PHI, as in today's electronic-centric world, their PII/PHI is required for numerous activities, such as new registrations to websites, or opening a new bank account, as well as signing up for special deals.

35.    Legitimate organizations and criminal underground alike recognize the value of PII/PHI. That is why they aggressively seek and pay for it.

36.    PII/PHI is highly valuable to hackers. Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. PII that is stolen from the point of sale are known as "dumps."[10]

37.    Once someone buys PII/PHI, it is then used to gain access to different areas of the victim's digital life, including bank accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

---

[10] *See All About Fraud: How Crooks Get the CVV*, Krebs on Security (April 26, 2016), https://krebsonsecurity.com/2016/04/all-about-fraud-how-crooks-get-the-cvv/    (last accessed February 22, 2023).

38.     In addition to PII/PHI, a hacked email account can be very valuable to cyber criminals. Since most online accounts require an email address not only as a username, but also to verify accounts and reset passwords, a hacked email account could open a number of other accounts to an attacker.[11]

39.     As shown below, a hacked email account can be used to link to many other sources of information for an identity thief, including any purchase or account information found in the hacked email account.[12]



40.     Hacked information can also enable thieves to obtain other personal information through "phishing." According to the Report on Phishing available on the United States,

---

[11]  *Identity Theft and the Value of Your Personal Data*, Trend Micro (Apr. 30, 2015), https://www.trendmicro.com/vinfo/us/security/news/online-privacy/identity-theft-and-the-value-of-your-personal-data. (last accessed February 22, 2023).

[12]  Brian Krebs, *The Value of a Hacked Email Account*, Krebs on Security (June 13, 2013), https://krebsonsecurity.com/2013/06/the-value-of-a-hacked-email-account/     (last accessed February 22, 2023).

Department of Justice's website: "AT&T, a large telecommunications company, had its sales system hacked into, resulting in stolen order information including full names and home addresses, order numbers and credit card numbers. The hackers then sent each customer a highly personalized e-mail indicating that there had been a problem processing their order and re-directing them to a spoofed website where they were prompted to enter further information, including birthdates and Social Security numbers."[13]

F.    **The Data Breach Has and Will Result in Additional Identity Theft and Identity Fraud**

41.    Highmark failed to implement and maintain reasonable security procedures and practices appropriate to protect the PII/PHI of Plaintiff and the Class Members. The ramification of Highmark's failure to keep Plaintiff and the Class Members' data secure is severe.

42.    Between 2005 and 2019, at least 249 million individuals were affected by health care data breaches.[14] In 2019 alone, over 505 data HIPAA data breaches were reported, resulting in over 41 million healthcare records being exposed, stolen, or unlawfully disclosed.[15] The frequency and severity of healthcare data breaches has only increased with time. 2021 was reported as the "worst ever year" for healthcare data breaches—with at least 44,993,618 healthcare records

---

[13]    *Report on Phishing* (Oct. 2006), https://www.justice.gov/archive/opa/docs/report_on_phishing.pdf (last accessed February 22, 2023).

[14]    *Healthcare Data Breaches: Insights and Implications*, National Library of Medicine (May 13, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/ (last accessed February 22, 2023).

[15]    *December 2019 Healthcare Data Breach*, HIPAA Journal (Jan 21, 2020), https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed February 22, 2023).

having been exposed or stolen across 585 breaches.[16]

43.    It is incorrect to assume that reimbursing a consumer for a financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, about a third (32%) spent a month or more resolving problems."[17] In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims." *Id*.

**G.    Annual Monetary Losses from Identity Theft are in the Billions of Dollars**

44.    Javelin Strategy and Research reports that losses from identity theft reached $21 billion in 2013. There may be a time lag between when harm occurs and when it is discovered, and also between when PII/PHI is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO, Report to Congressional Requesters (June 2007), http://www.gao.gov/new.items/d07 737.pdf. (last accessed February 22, 2023.)

45.    This is particularly the case with HIPAA data breaches such as Highmark's, as the information implicated, such as social security numbers and medical history, cannot be changed.

---

[16] "Largest Healthcare Data Breaches of 2021," HIPPA Journal (Dec. 30, 2021), https://www.hipaajournal.com/largest-healthcare-data-breaches-of-2021/ (last accessed February 22, 2023)
[17] *See Victims of Identity Theft*, U.S. Department of Justice (September 2015, revised November 13, 2017), https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last accessed February 22, 2023).

Once such information is breached, malicious actors can continue misusing the stolen information for years to come. Indeed, medical identity theft are one of the most common, most expensive, and most difficult-to-prevent forms of identity theft.[18] Victims of medical identity theft "often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[19]

46.     Indeed, a study by Experian found that the average total cost of medical identity theft is "nearly $13,500" per incident, and that many victims were forced to pay out-of-pocket costs for fraudulent medical care.[20] Victims of healthcare data breaches often find themselves "being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores."[21]

47.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any financial or identity fraud they suffer.

**H.    Plaintiff and Class Members Suffered Damages**

48.     The exposure of Plaintiff's and Class Members' PII/PHI to unauthorized third-party hackers was a direct and proximate result of Highmark's failure to properly safeguard and protect Plaintiff's and Class Members' PII/PHI from unauthorized access, use, and disclosure, as required by and state and federal law. The data breach was also a result of Highmark's failure to establish

---

[18]   Michael Ollove, *The Rise of Medical Identity Theft in Healthcare* (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/. (last accessed February 22, 2023).
[19]   *Id.*
[20]   *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last accessed February 22, 2023).
[21]   *Id.*

and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PII/PHI in order to protect against reasonably foreseeable threats to the security or integrity of such information, also required by their contracts and state and federal law.

49.    Plaintiff's and Class Members' PII/PHI is private and sensitive in nature and was inadequately protected by Highmark. Highmark did not obtain Plaintiff's and Class Members' consent to disclose their PHI/PII, except to certain persons not relevant to this action, as required by applicable law and industry standards.

50.    As a direct and proximate result of Highmark's wrongful actions and inaction and the resulting data breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing risk of harm from identity theft and identity fraud, requiring them to take the time and effort to mitigate the actual and potential impact of the subject data breach on their lives by, among other things, paying for credit and identity monitoring services, spending time on credit and identity monitoring, placing "freezes" and "alerts" with credit reporting agencies, contacting their personal, financial and healthcare institutions, closing or modifying personal, financial or healthcare accounts, and closely reviewing and monitoring their credit reports, financial accounts and healthcare accounts for unauthorized activity.

51.    Plaintiff and Class Members have also lost the value of their PII/PHI. PII/PHI is a valuable commodity, as evidenced by numerous companies which purchase PII from consumers, such as UBDI, which allows its users to link applications like Spotify, Twitter, or Apple Health and opt-in to paid opportunities to earn income, and Brave, which uses a similar business model, and by market-based pricing data involving the sale of stolen PII across multiple different illicit websites.

52.    Top10VPN, a secure network provider, has compiled pricing information for stolen PII, including $160.15 for online banking details, $35.00 for credit reports, and $62.61 for passports. Standalone Yahoo email accounts have been listed for as little as $0.41, while banking logins are in the range of $500, and verified PayPal accounts with high balances are listed at as much as $2,000.

53.    In addition, Privacy Affairs, a cyber security research firm, has listed the following prices for stolen PII:

| | |
|---|---|
| U.S. driving license, high quality: | $550 |
| Auto insurance card: | $70 |
| AAA emergency road service membership card: | $70 |
| Wells Fargo bank statement: | $25 |
| Wells Fargo bank statement with transactions: | $80 |
| Rutgers State University student ID: | $70 |

54.    Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII/PHI, including information, such as a Social Security numbers or diagnosis and medical treatment information, that is not easily, or outright cannot be changed in response to a data breach. As a result, a healthcare data record may be valued at up to **$250 per record**.[22]

55.    Highmark's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiff and Class Members' PII/PHI, causing them

---

[22]    "2018 Trustwave Global Security Report," TRUSTWAVE    https://trustwave.azureedge.net/media/15350/2018-trustwave-global-security-report-prt.pdf?rnd=131992184400000000    (last accessed December 12, 2022).

to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

    a.   The improper disclosure and theft of their PII/PHI;

    b.   The imminent and impending injury flowing from potential fraud and identity theft posed by their PII/PHI being exposed to and misused by unauthorized third-party hackers;

    c.   The untimely and inadequate notification of the data breach;

    d.   Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach; and

    e.   Ascertainable losses in the form of deprivation of the value of their PII/PHI, for which there is a well-established national and international market.

56.    Finally, Plaintiff and Class Members have lost the benefit of their bargains. Plaintiff and Class Members entered into agreements with and provided payment to Highmark under the reasonable but mistaken belief that it would reasonably and adequately protect their PII/PHI. Plaintiff and Class Members would not have entered into such agreements and would not have paid Highmark the amount that they paid had they known that Highmark would not reasonably and adequately protect their PII/PHI. Plaintiff and Class Members have thus suffered actual damages in an amount at least equal to the difference in value between the healthcare network services that include reasonable and adequate data security that they bargained for, and the healthcare network services that do not, which they actually received.

## CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action on her own behalf and pursuant to the Federal Rules of

Civil Procedure Rule 23(a), (b)(2), (b)(3), and (c)(4). Plaintiff intends to seek certification of the

following Classes, initially defined as follows:

> The "Nationwide Class":
> All persons residing in the United States of America who received a data breach notice informing them that their PII/PHI had been breached by unauthorized third parties as a result of Highmark, Inc.'s data breach.
>
> The "Pennsylvania Sub-Class":
> All persons residing in the State of Pennsylvania who received a data breach notice informing them that their PII/PHI had been breached by unauthorized third parties as a result of Highmark, Inc.'s data breach.

58.    Excluded from each of the above Classes is Highmark, including any entity in

which Highmark has a controlling interest, is a parent or subsidiary, or which is controlled by

Highmark, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors,

successors, and assigns of Highmark. Also excluded are the judge and the court personnel in this

case and any members of their immediate families. Plaintiff reserves the right to amend the Class

definitions if discovery and further investigation reveal that the Classes should be expanded or

otherwise modified.

59.    *Numerosity*, Fed. R. Civ. P. 23(a)(1):  The members of the Classes are so numerous

that the joinder of all members is impractical. The disposition of the claims of Class Members in

a single action will provide substantial benefits to all parties and to the Court. The Class Members

are readily identifiable from information and records in Highmark's possession, custody, or

control, such as reservation receipts and confirmations.

60.    *Commonality*, Fed. R. Civ. P. 23(a)(2) and (b)(3): There are questions of law and

fact common to the Classes, which predominate over any questions affecting only individual Class

Members. These common questions of law and fact include, without limitation:

    a.   Whether Highmark took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

    b.   Whether Highmark violated common and statutory by failing to implement reasonable security procedures and practices;

    c.   Which security procedures and which data-breach notification procedure should Highmark be required to implement as part of any injunctive relief ordered by the Court;

    d.   Whether Highmark knew or should have known of the security breach prior to the disclosure;

    e.   Whether Highmark has complied with any implied contractual obligation to use reasonable security measures;

    f.   Whether Highmark's acts and omissions described herein give rise to a claim of negligence;

    g.   Whether Highmark knew or should have known of the security breach prior to its disclosure;

    h.   Whether Highmark had a duty to promptly notify Plaintiff and Class Members that their PII/PHI was, or potentially could be, compromised;

    i.   What security measures, if any, must be implemented by Highmark to comply with its duties under state and federal law;

    j.   The nature of the relief, including equitable relief, to which Plaintiff and the Class Members are entitled; and

    k.   Whether Plaintiff and the Class Members are entitled to damages, civil

penalties, and/or injunctive relief.

61.    *Typicality*. Fed. R. Civ. P. 23(a)(3):  Plaintiff's claims are typical of those of other Class Members because Plaintiff's PHI/PII, like that of every other Class Member, was misused and/or disclosed by Highmark.

62.    *Adequacy of Representation*, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiff has retained competent counsel experienced in litigation of class actions, including consumer and data breach class actions, and Plaintiff intends to prosecute this action vigorously. Plaintiff's claims are typical of the claims of other members of the Classes and Plaintiff has the same non-conflicting interests as the other Class Members. Therefore, the interests of the Classes will be fairly and adequately represented by Plaintiff and her counsel.

63.    *Superiority of Class Action*, Fed. R. Civ. P. 23(b)(3): A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Classes is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

64.    Damages for any individual class member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Highmark's violations of law inflicting substantial damages in the aggregate would go un-remedied.

65.    Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2), because Highmark has acted or refused to act on grounds generally applicable to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Classes as a

whole.

## CAUSES OF ACTION

## <u>FIRST CAUSE OF ACTION</u>

**Violation of the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.***

(On behalf of Plaintiff and the Nationwide Class)

66.     Plaintiff repeats and incorporates herein by reference each and every allegation contained in paragraphs 1 through 65, inclusive, of this Complaint as if set forth fully herein.

67.     The Stored Communications Act ("SCA"), 18 U.S.C. § 2701, *et seq.* provides consumers with redress if a company mishandles their electronically stored information, such as PHI/PII. The SCA was designed, in part, to protect individuals' privacy interests in personal and proprietary information.

68.     Section 2702(a)(1) of the SCA states that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

69.     "Electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

70.     Through its computer equipment, Highmark provides an "electronic communication service to the public" within the meaning of the SCA.

71.     By failing to take reasonable steps to safeguard Plaintiff's and Class Members' PHI/PII while in electronic storage, Highmark has allowed unauthorized access to its electronic systems and knowingly divulged patient PHI/PII.

72.     Section 2702(a)(2)(A) of the SCA provides that "a person or entity providing

remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service on behalf of, and received by means of electronic transmission from (or created by means of computer processing or communications received by means of electronic transmission from), a subscriber or customer of such service." 18 U.S.C. § 2702(a)(2)(A).

73.    "Remote computing service" is defined as "the provision to the public of computer storage or processing services by means of an electronic communications system." 18 U.S.C. § 2711(2).

74.    "Electronic communications system" is defined as "any wire, radio, electromagnetic, photo-optical or photo electronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications." 18 U.S.C § 2510(14).

75.    Highmark stores its patients' PHI/PII and utilizes such information to provide services to its patients.

76.    By failing to take reasonable steps to safeguard PHI/PII and allowing its computer systems to be breached, Highmark knowingly divulged Plaintiff's and Class Members' PHI/PII, and which allowed unauthorized persons to access and use the PHI/PII for improper purposes.

77.    Upon learning that its systems had been intruded upon and information had been obtained and accessed by unauthorized third parties, Highmark failed to promptly inform Plaintiff and Class Members of the data breach and continued to knowingly divulge PHI/PII to third parties.

78.    Plaintiff and Class Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

## SECOND CAUSE OF ACTION

### Negligence

(On behalf of Plaintiff and the Nationwide Class)

79.    Plaintiff repeats and incorporates herein by reference each and every allegation contained in paragraphs 1 through 78, inclusive, of this Complaint as if set forth fully herein.

80.    Highmark requires any individual that uses its services to provide its PII and PHI to Highmark. Highmark collects and stores this PII and PHI as a part of its regular business activities, and for its own pecuniary gain.

81.    Highmark owed Plaintiff and the Class Members a duty of care in the handling of its patient's PII/PHI. This duty included, but was not limited to, keeping that PII/PHI secure and preventing disclosure of the PII/PHI to any unauthorized third parties. This duty of care existed independently of Highmark's contractual duties to Plaintiff and the Class Members. Under the FTC Guidelines, and other sources of industry-wide cybersecurity standards, Highmark is obligated to incorporate adequate measures to safeguard and protect PII/PHI that is entrusted to it in its ordinary course of business and transactions with customers.

82.    Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Highmark had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII/PHI. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the businesses' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders from these actions further clarify the

measures businesses are required to undertake to satisfy their data security obligations. [23]

83.    Additional industry guidelines which provide a standard of care can be found in NIST's *Framework for Improving Critical Infrastructure Cybersecurity*.[24] NIST's Framework identifies seven steps for establishing or improving a cybersecurity program (section 3. 2). Those steps are:

> *Step 1: Prioritize and Scope*. The organization identifies its business/mission objectives and high-level organizational priorities. With this information, the organization makes strategic decisions regarding cybersecurity implementations and determines the scope of systems and assets that support the selected business line or process. The Framework can be adapted to support the different business lines or processes within an organization, which may have different business needs and associated risk tolerance. Risk tolerances may be reflected in a target Implementation Tier.
>
> *Step 2: Orient*. Once the scope of the cybersecurity program has been determined for the business line or process, the organization identifies related systems and assets, regulatory requirements, and overall risk approach. The organization then consults sources to identify threats and vulnerabilities applicable to those systems and assets.
>
> *Step 3: Create a Current Profile*. The organization develops a Current Profile by indicating which Category and Subcategory outcomes from the Framework Core are currently being achieved. If an outcome is partially achieved, noting this fact will help support subsequent steps by providing baseline information.
>
> *Step 4: Conduct a Risk Assessment*. This assessment could be guided by the organization's overall risk management process or previous risk assessment activities. The organization analyzes the operational environment in order to discern the likelihood of a cybersecurity event and the impact that the event could have on the organization. It is important that organizations identify emerging risks and use cyber threat information from internal and external sources to gain a better understanding of the likelihood and impact of cybersecurity

---

[23] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement (last accessed February 22, 2023).

[24] "Framework for Improving Critical Infrastructure Cybersecurity," National Institute for Standards and Technology, https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.041620 18.pdf (last accessed February 22, 2023).

events.

*Step 5: Create a Target Profile*. The organization creates a Target Profile that focuses on the assessment of the Framework Categories and Subcategories describing the organization's desired cybersecurity outcomes. Organizations also may develop their own additional Categories and Subcategories to account for unique organizational risks. The organization may also consider influences and requirements of external stakeholders such as sector entities, customers, and business partners when creating a Target Profile. The Target Profile should appropriately reflect criteria within the target Implementation Tier.

*Step 6: Determine, Analyze, and Prioritize Gaps*. The organization compares the Current Profile and the Target Profile to determine gaps. Next, it creates a prioritized action plan to address gaps – reflecting mission drivers, costs and benefits, and risks – to achieve the outcomes in the Target Profile. The organization then determines resources, including funding and workforce, necessary to address the gaps. Using Profiles in this manner encourages the organization to make informed decisions about cybersecurity activities, supports risk management, and enables the organization to perform cost-effective, targeted improvements.

*Step 7: Implement Action Plan*. The organization determines which actions to take to address the gaps, if any, identified in the previous step and then adjusts its current cybersecurity practices in order to achieve the Target Profile. For further guidance, the Framework identifies example Informative References regarding the Categories and Subcategories, but organizations should determine which standards, guidelines, and practices, including those that are sector specific, work best for their needs.

84.    In addition to its obligations under state and federal regulations and industry standards, Highmark owed a duty to Plaintiff and the Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII/PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Highmark owed a duty to Plaintiff and the Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the PII/PHI of Plaintiff and the Class Members.

85.    Highmark owed a duty to Plaintiff and the Class Members to design, maintain, and test its internal data systems to ensure that the PII/PHI in Highmark's possession was adequately secured and protected.

86.    Highmark owed a duty to Plaintiff sand the Class Members to create and implement reasonable data security practices and procedures to protect the PII/PHI in its custodianship, including adequately training its employees and others who accessed PII/PHI within its computer systems on how to adequately protect PII/PHI.

87.    Highmark owed a duty to Plaintiff and the Class Members to implement processes or safeguards that would detect a breach of its data security systems in a timely manner.

88.    Highmark owed a duty to Plaintiff and the Class Members to act upon data security warnings and alerts in a timely fashion.

89.    Highmark owed a duty to Plaintiff and the Class Members to timely disclose if its computer systems and data security practices were inadequate to safeguard individuals' PII/PHI from theft because such an inadequacy would be a material consideration in Plaintiff's and Class Members' decisions to entrust their PHI/PII to Highmark.

90.    Highmark owed a duty to Plaintiff and the Class Members to disclose in a timely and accurate manner when data breaches occur.

91.    Highmark owed a duty of care to Plaintiff and the Class Members because they were foreseeable and probable victims of any inadequate data security practices and systems. Highmark collected PII/PHI from Plaintiff and the Class Members. Highmark knew that a breach of its data systems would cause Plaintiff and the Class Members to incur damages.

92.    Highmark breached its duties of care to safeguard and protect the PII/PHI which Plaintiff and the Class Members entrusted to it. Upon information and belief, Highmark adopted

inadequate safeguards to protect the PII/PHI and failed to adopt industry-wide standards set forth above in its supposed protection of the PII/PHI. Highmark failed to design, maintain, and test its computer system to ensure that the PII/PHI was adequately secured and protected, failed to create and implement reasonable data security practices and procedures, failed to implement processes that would detect a breach of its data security systems in a timely manner, failed to disclose the breach to potentially affected customers in a timely and comprehensive manner, and otherwise breached each of the above duties of care by implementing careless security procedures which led directly to the breach.

93.    Highmark breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the NIST's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Highmark failed to implement proper data security procedures to adequately and reasonably protect Plaintiff and Class Member's PII/PHI. In violation of the FTC guidelines, *inter alia*, Highmark did not protect the personal customer information that it keeps; failed to properly dispose of personal information that was no longer needed; failed to encrypt information stored on computer networks; lacked the requisite understanding of their network's vulnerabilities; and failed to implement policies to correct security problems. In violation of the NIST's Framework, Defendant, *inter alia*, failed to adopt sufficient resources to identify and address security gaps.

94.    Highmark's failure to comply with applicable laws and regulations constitutes negligence per se.

95.    As a direct and proximate result of Highmark's failure to adequately protect and safeguard the PII/PHI, Plaintiff and the Class Members suffered damages. Plaintiff and the Class Members were damaged because their PII/PHI was accessed by third parties, resulting in increased

risk of identity theft, property theft and extortion for which Plaintiff and the Class Members were forced to adopt preventive and remedial efforts. These damages were magnified by the passage of time because Highmark failed to notify Plaintiff and Class Members of the data breach until weeks had passed. In addition, Plaintiff and Class Members were also damaged in that they must now spend copious amounts of time combing through their records to ensure that they do not become the victims of fraud and/or identity theft.

96.     Plaintiff and Class Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

### THIRD CAUSE OF ACTION

### Breach of Implied Contract

(On behalf of Plaintiff and the Nationwide Class)

97.     Plaintiff repeats and incorporates herein by reference each and every allegation contained in paragraphs 1 through 96, inclusive, of this Complaint as if set forth fully herein.

98.     Plaintiff and Class Members entered into agreements for medical treatment with Highmark. In making those agreements, Highmark solicited and invited Plaintiff and Class Members to provide their PII and PHI to Defendant as requirement of receiving service. Plaintiff and Class Members accepted Highmark's offers and provided their PII and PHI to enter the agreements. Inherent within those agreements was an implied contractual obligation that Highmark would implement reasonable and adequate data security to safeguard and protect the PII and PHI entrusted to it by Plaintiff and Class Members from unauthorized disclosure.

99.     Thus, when Plaintiff and Class Members provided their PII and PHI to Highmark in exchange for healthcare network services, they entered into implied contracts with Highmark

under which Highmark agreed to and was obligated to reasonably protect their PII and PHI. Plaintiff and Class Members provided payment to Highmark, as well as their PII and PHI, under the reasonable but mistaken belief that any money they paid to Highmark in connection to its provision of healthcare network services would be used in part to provide reasonable and adequate data security for their PII and PHI.

100.    This implied contract is acknowledged and memorialized in Highmark's customer-facing documents, including, *inter alia*, Highmark's online public-facing Notice of Privacy Practices, wherein it promises that "we are committed to protecting the privacy of your Protected Health Information," "[w]e restrict access to our members' non-public personal information to those employees, agents, consultants and healthcare providers who need to know that information to provide health products or services" and "[w]e maintain physical, electronic and procedural safeguards that comply with state and federal regulations to guard non-public personal financial information from unauthorized access, use and disclosure."

101.    Highmark did not provide reasonable and adequate data security for Plaintiff's and Class Member's PII and PHI, and instead caused it to be disclosed to unauthorized third-party hackers. Highmark did not comply with federal statute and regulation and did not comply with industry data security standards. In doing so, Highmark materially breached their obligations under implied contract.

102.    That Highmark would implement such reasonable and adequate data security was a material prerequisite to the agreements between Highmark and Class Members. Reasonable consumers value the privacy of their PII and PHI, and do not enter into agreements for services with healthcare networks which are known not to protect customer data. Accordingly, Plaintiff and Class Members would not have entered into agreements with Highmark and would not have

provided them with their sensitive PII and PHI, had they known that Highmark would not implement such reasonable and adequate data security.

103.    As a result of Highmark's breach, Plaintiff and Class Members have lost the benefit of their bargains. Plaintiff and Class Members entered into agreements with Highmark under the reasonable but mistaken belief that it would reasonably and adequately protect their PII/PHI and would not have entered into such agreements had they known that Highmark would not reasonably and adequately protect their PII/PHI. Plaintiff and Class Members have thus suffered actual damages in an amount at least equal to the difference in value between the healthcare network services that include reasonable and adequate data security that they bargained for, and the healthcare network services that do not that they actually received.

104.    Plaintiff and Class Members fully performed their obligations under the implied contract by providing their PII/PHI and making payments to Highmark.

105.    Plaintiff and Class Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

**FOURTH CAUSE OF ACTION**

**Quasi-Contract/Unjust Enrichment**

(On behalf of Plaintiff and the Nationwide Class)

106.    Plaintiff repeats and incorporates herein by reference each and every allegation contained in paragraphs 1 through 105, inclusive, of this Complaint as if set forth fully herein.

107.    Plaintiff and Class Members provided their PII and PHI and conferred a monetary benefit upon Highmark in exchange for healthcare services. Plaintiff and Class Members did so under the reasonable but mistaken belief that part of their monetary payment to Highmark would

cover the implementation of reasonable, adequate, and statutorily mandated safeguards to protect their PII and PHI. Highmark was enriched when it sold its healthcare services at a higher price than it otherwise would have based on those reasonable but mistaken beliefs.

108.    Highmark's enrichment came at the expense of Plaintiff and Class Members, who would not have paid for Highmark's services, or would have only been willing to paid substantially less for them, had they been aware that Highmark had not implement reasonable, adequate and statutorily mandated safeguards to protect their PII and PHI.

109.    As a direct and proximate result of Highmark's wrongful actions and inactions, Plaintiff and Class Members suffered have suffered damages in the form of their lost benefit of the bargains. Plaintiff and Class Members entered into agreements with Defendant under the reasonable but mistaken belief that it would reasonably and adequately protect their PII/PHI. Plaintiff and Class Members would not have entered into such agreements had they known that Highmark would not reasonably and adequately protect their PII/PHI. Plaintiff and Class Members have thus suffered actual damages in an amount at least equal to the difference in value between the healthcare network services that include reasonable and adequate data security that they bargained for, and the healthcare network services that do not that they actually received.

110.    Highmark should not be permitted to retain Plaintiff's and Class Members' lost benefits, without having adequately implemented the data privacy and security procedures for itself that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws. and industry standards. Highmark should not be allowed to benefit at the expense of consumers who trust Highmark to protect the PII and PHI that they are required to provide to Highmark to receive Highmark's services.

111.    As a direct and proximate result of Highmark's fraudulent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

## FIFTH CAUSE OF ACTION

**Breach of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Const. Stat. §§ 201-2 & 201-3, *et seq.***

(On behalf of Plaintiff and the Pennsylvania Sub-Class)

112.    Plaintiff repeats and incorporates herein by reference each and every allegation contained in paragraphs 1 through 111, inclusive, of this Complaint as if set forth fully herein.

113.    Highmark is a "person" as defined under 73 Pa. Cons. Stat. § 201-2(2).

114.    Plaintiff and Pennsylvania Sub-Class members purchased goods and services from Highmark in "trade" and "commerce," primarily for personal, family and/or household purposes, as defined under 73 Pa. Cons. Stat. §201-2(3).

115.    Highmark engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of § 201-2(3) by engaging in the following:

      i.    Representing that its goods and services have characteristics, uses, benefits, and qualities that they do not have. 73 Pa. Cons. Stat. § 201-2(4)(v);

      ii.    Representing that its goods and services are of a particular standard or quality if they are another 73 Pa. Cons. Stat. § 201-2(4)(vii);

      iii.    Advertising its goods and services with intent not to sell them as

advertised 73 Pa. Cons. Stat. § 201-2(4)(ix).

116.    Specifically, Highmark engaged in unfair methods of competition and unfair or deceptive acts or practices by, *inter alia*, representing to its members that it had implemented reasonable and adequate data security safeguards to protect their PII/PHI, when in fact it had not implemented such reasonable and adequate data security safeguards.

117.    Highmark's misrepresentations and omissions regarding its data security safeguards were material because they were likely to deceive reasonable consumers.

118.    Had Highmark disclosed to Plaintiff and Sub-Class Members that it had not implemented reasonable and adequate data security safeguards to protect their PII/PHI and was otherwise engaged in unfair and deceptive business practices, Plaintiff and Sub-Class Members would not have entered into contracts for service with Highmark. Instead, Plaintiff and Sub-Class Members acted reasonably in relying on Highmark's misrepresentations and omissions, the truth of which they could not have discovered.

119.    As a direct and proximate cause of Highmark's unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and Sub-Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from the loss of value of their PII/PHI, their lost time and out-of-pocket expenses in dealing with the data breach, and the loss of the benefit of their bargain.

120.    Accordingly, Plaintiff and Sub-Class Members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, attorney's fees and costs, and any additional relief the Court deems necessary or proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all the Class Members, respectfully requests that the Court enter judgment in her favor and against Highmark as follows:

1.    For an Order certifying the Classes as defined herein and appointing Plaintiff and her Counsel to represent the Classes;

2.    For equitable relief enjoining Highmark from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII/PHI, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

3.    For equitable relief compelling Highmark to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity to Class Members the type of PII/PHI compromised.

4.    For an award of damages, including actual, statutory and compensatory damages, in an amount to be determined at trial;

5.    For an award of costs of suit, litigation expenses and attorneys' fees, as allowable by law; and

6.    For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and all others similarly situated, hereby demands a jury trial for all claims so triable.

Dated: March 3, 2023                                   Respectfully Submitted,

*/s/ Shaheen Z. Wallace*
_____
Shaheen Z. Wallace
Pennsylvania Bar Number: 319893

**The Law Office of Shaheen Wallace, Esq.**
*Counsel for Plaintiff*
5850 Ellsworth Ave., Ste 230
Pittsburgh, Pennsylvania 15232
Telephone: (412) 345-1164
Primary Email: szw@wallaceinjury.com

*/s/ Thiago M. Coelho*
_____
Thiago M. Coelho, Esq.*
*\*pro hac vice forthcoming*

**Wilshire Law Firm, PLC**
*Counsel for Plaintiff*
3055 Wilshire Boulevard, 12th Floor
Los Angeles, California 90010
Telephone: (213) 381-9988
Primary Email: thiago@wilshirelawfirm.com
Secondary Email: teamthiago@wilshirelawfirm.com